6I2

Wm. A. Ambrose, Prosecuting Attorney, Youngstown, for plaintiff-appellee.

Harry Evans, Youngstown, for defendant-appellant.

## OPINION

By ROBERTS, J.

This cause is in this Court of Appeals on an appeal designated as appeal of law and fact. The parties will be hereinafter referred to as the State and the appellant. At the September term, 1936, in the Court of Common Pleas the appellant, a young woman nineteen years of age, was found guilty by a jury of murder in the second degree and was sentenced by the trial court to a life term in the Marysville State Reformatory for Women. The grand jury returned an indictment against her for murder in the second degree on the 22nd day of January, 1936, the grand jury finding that Anna Kowalewsky, the appellant, late of said county on the 6th day of December in the year of our Lord 1935, at the County of Mahoning aforesaid, unlawfully, purposely and maliciously killed John Pregar Kowalcwsky. The appellant filed a reply to the indictment as follows:

"Now comes the defendant, Anna Kowalewsky, by and through her attorney, and to the indictment found against her by the grand jury of this county, enters a plea of not guilty and not guilty by reason of insanity."

The person the appellant was so indicted for killing was the son of the appellant and was two days old at the time of his death. On March 2nd, 1936, the cause came on for hearing before a Common Pleas Judge of this county and a jury, with the result that after deliberating, as said, for about twenty hours, the jury failed to reach an agreement on the verdict and was discharged by the court. The appellant was again brought to trial before the same court in April, 1936. This jury failed to agree and was discharged by the court. In the following May term, 1936, the appellant, who up to this time had been confined in the county jail for a period of some six months, was released on her own recognizance pending a decision as to whether she should be brought to trial for a third time. She was thus at liberty until October, 1936, when she was again tried upon the indictment returned against her by another judge of the Court of Common Pleas of Mahoning County. She was at this time found guilty by the jury of murder in the second degree and was sentenced to a life of imprisonment.

It is claimed in her behalf that prejudicial and reversible error occurred in several respects during the trial in the Court of Common Pleas, for which she claims she is entitled to a reversal of the judgment of conviction rendered on the verdict. In attempting to prepare and secure a bill of exceptions for the prosecution of

an appeal to this court, it was discovered for the first time, so far as the appellant and her attorney are concerned, that it was impossible to secure a transcript of the testimony taken in the trial in the Court of Common Pleas. So far as indicated in this case this condition was wholly unknown to anyone participating in the trial. A stenographer was assigned to take the evidence and sat at his desk, apparently taking the testimony. After the trial was completed it was learned that through an unknown temporary disability of the stenographer he was unable to take the testimony in shorthand, and although during the introduction of evidence he seemed to be busily employed in so doing, his work is said to have been a mere scribbling which neither he nor anyone else could read. An arrangement was ultimately made by counsel for the appellant and the prosecutor's office, whereby the bill of exceptions which had been prepared in the first trial, and in which the evidence, so far as it went, is said not to have been materially different than the evidence in the last or third trial, might be used and considered as a bill of exceptions in this case, to be supplemented by an agreed additional statement of facts, which stipulation was agreed upon by respective counsel and filed in the case. Difficulty is to some extent involved in under these conditions determining definitely some conditions which might be of considerable importance in a consideration of the bill of exceptions and the determination of what actually took place. Objections and exceptions to some extent have become unascertainable, and whether or not in all instances in the stipulation and agreement exceptions were preserved may be somewhat uncertain. However, counsel have been quite liberal in agreeing upon the bill of exceptions and the agreed statement of facts, and it is not thought that any particular difficulty will be encountered in this respect.

It has been before stated that the appellant entered a plea of not guilty and not guilty by reason of insanity. It is not contended by or in behalf of the appellant that she did not commit the overt act resulting in the death of her child. It is contended for her and in her behalf that she is not guilty of the charge by reason of insanity, which, if sufficiently established, would be a complete defense to the indictment. The issue in the case, therefore. is largely devoted to the proposition as to the mental condition of the appellant at the time she admittedly administered the lysol to her two days old child, from which it died a few days later. Evidence which was received as competent in the trial regarding her previous life was to the effect that the appellant was born on or about May 22nd, 1916, in the city of Youngstown. Her father died when she was five years old and her mother died when she was about twelve years of age. After the death of her mother she, with two younger brothers, was taken in custody by the Youngstown Humane Society, who in turn called on the Catholic Charities, which organization then took charge of her and her younger brothers. The brothers were sent to a Catholic institution at Lackawana, New York. Anna was subsequently taken to the Anna Marie Receiving Home, a home maintained by the Catholic Charities in the city of Youngstown. Miss Agnes O'Conner, a social worker employed by the Social Service League, took charge of Anna during the time that she was under the jurisdiction of the Catholic Charities. She took a great interest in the appellant, looked after her welfare and procured for her homes in which to live during her girlhood. When the appellant was seventeen years of age she was in the fourth grade at school and then met Alex Kowalewsky in May, 1935. They were married in church November 30, 1935. On December 4, 1935, four days after she married, the baby was born. On December 6th, two days after its birth, Anna gave this baby lysol, from the effects of which it died.

It is learned from the record that before Anna was delivered of her baby, Dr. Kocialek, a physician and surgeon who maintained his office in the neighborhood where Anna and her husband were living, was called on this case. This was the first time that the doctor had met Anna or her husband. He attended her during her confinement, and on December 6th, immediately after the lysol had been administered to the baby, this doctor made his daily visit to the home where Anna was living that he might see her, as she was then his patient. He ordered the baby taken to the hospital, saw Anna immediately after the baby became ill from the taking of this lysol, tried to talk to her and question her. The doctor's testimony will receive further comment in the consideration of this case.

In addition to the doctor's testimony, as appearing in the bill of exceptions, the stipulation and agreement recognizes further testimony given by the doctor at the third trial, at which the appellant was convicted, as follows:

"That there are numerous occasions wherein a young woman giving birth to her first baby suffers a mental derangement by reason of such child birth, but under cross examination by Mr. Church he testified that appellant did not have postpartum insanity However, Dr. Kocialek did testify that he was present immediately after this act was committed on the part of the appellant and that by reason of his observations as more fully contained in the record of this case filed herein, was of the unquestionable opinion that the appellant was insane at the time of the commission of this act."

It is further agreed in this stipulation that:

"Michael Flynn, a detective, who had testified on behalf of the State was called by the State as a rebuttal witness for the purpose of rebutting the testimony of Dr. Kocialek. Upon questioning by Mr. Church, Mr. Flynn testified substantially as follows:

"He is a married man, and his wife has given birth to four children; that he had observed his wife after the birth of each child; that when he saw the defendant, she appeared no different to him than his wife had appeared under the same circumstances.

"It is further stipulated and agreed by and between counsel that there were several prospective jurors dismissed by the trial court upon his own motion after questioning by the court, neither counsel being afforded an opportunity for the questioning of said jurors so dismissed.

"It is further stipulated and agreed by and between counsel that immediately after the jury had returned its verdict of guilty, the trial court before sentence, and in the presence of the jury, called the appellant a fiend and a monster."

This, being after the return of the verdict, could not have affected the jury, but does indicate the mental attitude of the trial judge in this case, which attitude may have been reflected to some extent to the jury during the trial.

It is claimed that the verdict is contrary to law and that it is against the weight of the evidence. It will be recalled that the only issue is as to the mental responsibility of the appellant at the time she caused the death of her child.

Dr. M. L. Kocialek, before mentioned, testified quite fully upon this proposition, and he was the only doctor or expert witness who testified concerning the circumstances observed by him at the time of the confinement of the mother and the death of the child. His preliminary testimony indicated good qualifications for his testimony as an expert. Quotation is made from his testimony, commencing at the bottom of page 52 of the record:

"Q. Did you observe at that time Anna's condition?

A. I did.

Q. Tell us in your own words, Doctor, what you observed about Anna?

A. Well, first when I got in the house and they showed me that child I was mad, and I went into Anna's room, and I was ready to give her everything I thought of for doing it and I started and looked at her features, I looked at her face and realized that girl didn't even know what I was telling her. When I was telling her that, she was pale, she had beads of perspiration, her eyes staring and dilated, and when I kept asking why she did it she said she didn't know, that is all she kept answering; she didn't know why, and I said 'why didn't you take it yourself,' and she said, 'I don't know.' She had a very rapid pulse at the time, but what got me was the expression, her eyes dilated and had that wild look on her eyes, and she was pale as a rag, and during the two days before she had always color in her face."

And again, on page 56, in the middle of the page:

"Q. Tell us, please, what your conversations were with her and what you had learned?

A. Well, when I first went to deliver her and I delivered her, I noticed her strange acting after the delivery. The following day I told her to put the baby to the breast and she seemed absent-minded; each time she said 'Yes, that is right. I forgot.' She seemed to be thinking, and then the day that that baby, that they called me for the baby is when she was in her extreme anxiety at that time, so that night she couldn't tell me she was—she said, after I think I was in there half to three-quarters of an hour, and I talked to her and said 'Tell me, why did you do it.' She said she didn't know why except she was going to lose her husband. She said 'This is the first time in my life I knew what happiness was, and now it is going to go away from me,' and that was that night and she didn't seem to be a bit remorseful. She was in that tension. She

didn't shed a tear or exchange her expression, but the following day I talked to her again and she cried and she said—she asked me if the baby is going to live. I said, 'I think it will,' not to worry her. And during that whole period I came there I kept on telling her I think the baby was going to live, and I never told her when the baby died. She would ask me every time I come in, I would lock the door and she would ask me and I would tell her the baby is going to live, not to worry.

Q. Now, Doctor, from what you observed about Anna immediately after the baby was born, and from what you observed about her immediately after the baby was born, and also what your observation was at the time that you were summoned and found that the baby had been injured and taking into consideration the things that you had learned from Anna about what had transpired in her life-time, are you prepared here to say what your diagnosis and prognosis of Anna's case was or is?

A. Surely, yes.

Q. Tell us, please?

A. I would say that her diagnosis at that time was an anxiety and fear neurosis. She was anxious. She was fearful. She didn't know what to do. She knew that the baby wasn't her husband's towards the end, and she just brooded about it from the very beginning, and she had that fear and anxiety continually when she told me she knew what happiness was. I think she just committed a compulsory act, something that came without her and she didn't know what she was doing.

Q. Would you want to say to this jury whether or not in your opinion at the time of the commission of this act Anna was sane or insane?

A. She didn't know what she was doing. I could guarantee that. I could swear to it.

Q. Would you want to say to this jury what your opinion was with respect to Anna at the time of the commission of this act, whether or not she could distinguish between right and wrong?

A. I don't think she could, not the way I found her, the way she looked.

Q. And is it possible, Doctor, for a girl such as Anna, having committed an act such as she is charged with having committed here, to be out of her mind at the time of the commission of the act, to be unable to distinguish between right and wrong at that time and subsequently recover and still be normal as she was before?

A. Sure it is. An anxiety or fear neurosis—those are the things that happen."

. In the cross examination of the doctor we call attention to the following:

"Q. Of course, at that time after you had gotten there on the 6th, wasn't she also under the tension of what she had done with this lysol? Do you think that would put her under some tension?

A. She was under such tension she didn't know what she was doing. She didn't know I was talking to her.

Q. So you think she knew she had given the baby lysol?

A. She told me she didn't and I really believed she didn't, because I asked her. I said, 'You know what the consequences will be,' and she said 'I don't know; I don't care; that is all.'

Q. It would be your opinion then at the time you saw her on the 6th, the night that the baby was given the lysol, that at the time you saw her she didn't know at that time she had given this baby the lysol?

A. I don't think she did, no."

Attention is now directed to the so-called expert medical testimony offered by the State, namely Dr. D. H. Smeltzer and Dr. W. E. Ranz. Dr. Smeltzer testified concerning his medical education and that he had specialized in nervous and mental troubles; that he made an examination of the appellant on the 26th day of February, 1936. This was nearly two months after the alleged offense and when there is no contention but that the appellant had recovered from her temporary insanity at the time of the death of the child. The following question was asked:

"Q. And what was the object of your making that examination?

A. To determine whether this individual is sane at the present time or whether there has been an insanity in her makeup at some time previous to the examination."

No one claimed that she was insane at the time the examination was made. The doctor testifies at considerable length, saying in part:

"A. But still at the same time there was no evidence there that this individual was insane at any of these periods."

There was no claim on the part of the defense that she was insane during these periods. The doctor further says:

"A. The individual, of course, has a low grade mentality so far as education is concerned. Of course she is very low in that regard; for instance, I asked her if I gave her a dollar and sent her to the store to get me thirty cents worth of meat and a quarter's worth of bread, how much change she would bring back, and she said seventy-five cents, and I told her that was wrong and she said fifty cents. That just shows the learning of the individual."

The reasoning of the learned doctor would seem to be that ignorance is a decided tendency toward insanity. The doctor again repeats with regard to her alleged low intelligence. He was then asked this question:

"Q. What do you say as to that time, at the time she gave the baby the lysol, was she a free agent in performing and committing this act?
A. Yes she was, for this reason: she had a definite purpose which she told me she knew that particular thing was wrong which she told me and her reactions afterwards were the reactions of an individual that has realized that she has done wrong and now is responding to that particular thing."

That she told the doctor two months afterward that she then knew that her act was wrong and realized that she had done wrong, has no particular application to the proposition in issue and that ▆▆▆▆▆▆ ▆ was her mental condition at the time the child died. In conclusion of direct examination this question was asked:

"Q. From what you learned at the time of the examination you want to say to this jury that back in December, December 6th, Anna Kowalewsky was sane?
A. Yes, I do say that."

Responsive to this testimony, it is suggested that the doctor has testified to no fact or circumstance of importance or such as would be able to determine the temporary mental condition of this girl two months earlier. The other medical expert called, Dr. Wm. E. Ranz, testifies to some familiarity with mental and nervous diseases that he acquired on account of being a general surgeon. This question was asked of the doctor on page 94:

"Q. And in making that examination what was your purpose, that is, what were you searching for?

A. My purpose was to ascertain as near as I could the truth as to her mental status at the present time."

Whether the doctor intended that he should be understood as testifying to the mental status of the appellant at the time he testified or at the time he made the examination is not clear, but, in any event, his examination, by his own statement, did not refer to the important time, and that is in the latter part of December or when the child died, and when there is no dispute but that the appellant had fully recovered from her temporary mental disability. Later he testifies that he carried his investigation to determination of her mental status on the 6th of December. This was by numerous inquiries and obtaining from her a description of her previous life. This question was asked:

"Q. What would you say as to her condition on the 6th day of December, 1935, when she administered lysol to her two day old baby?"

The doctor gave this answer:
"A. I would say that she knew that she wasn't doing the right thing at the time, because any administration of a drug or a poison that will destroy life to anyone that is six years of age that has had any training whatsoever, knows that that is not right."

To this answer comment may be made that it might apply correctly to a sane person, but has no application to a condition of temporary insanity.

These three doctors are the witnesses who give practically all of the testimony concerning the mental responsibility of the appellant, and with them must be considered Michael Flynn, hereinbefore mentioned, a policeman who testified that he is a married man and his wife has given birth to four children and that he had observed his wife after the birth of each child, and that he saw the defendant and she appeared no different to him than his wife had appeared under the same circumstances. No doubt is entertained of the incompetency of this testimony, based upon the experience of the policeman in observing the condition of his ▆▆▆▆▆▆ ▆ wife after the birth of her children. He was not only incompetent to testify upon this subject, and his testimony entitled to no weight, but prejudicial error occurred in the sub-

mission of this evidence to the jury. Without attempting to compare the testimony of the policeman with the two doctors who testified for the State, so far as shown by the record, the policeman testified without compensation. The record does disclose, however, that the two doctors testifying for the State each received one hundred dollars for making the examination of the appellant and testifying in court. Generosity of the State in this respect is noticeable by comparison with the attitude of the Common Pleas Court in, as is said and not understood to be disputed, that compensation to attorneys attending indigent prisoners has been consistently refused for several years. This appellant, from the testimony, was evidently in destitute circumstances at the time of her arrest and at the time of her trial.

Attention is directed to §10, Article 1, of the Constitution of the State of Ohio, in which it is provided:

"No person shall be compelled, in any criminal case, to be a witness against himself."

The provision of the Constitution was violated by the State in numerous instances in connection with this indictment against the appellant. Within two days after the birth of her baby, when she was in the condition incident to women in confinement, she was put in charge of police matrons until she could be taken to the jail. Policeman Flynn was sent to interview this woman about the same time. Other witnesses were called, who also testified to what she said and how she appeared, and then, as appears of record, on March 3rd, 1936, Dr. D. H. Smeltzer and Dr. W. E. Ranz were appointed as alienists for the examination of the defendant nunc pro tunc as of February 17, 1936, the nunc pro tunc order evidently being to indicate authority of the doctors to call and examine the appellant. Presumably the prosecuting attorney knew of the constitutional immunity of the appellant from testifying against herself, yet in these several instances, without notice to her or to her attorney, if she had one, these witnesses were sent to observe and interrogate her, and so far as the insanity proposition was concerned to testify concerning her appearance which afforded protection as fully as from any oral statement she might make. This applies to the examination of the doctors when she was a prisoner in the county jail. This poor, uneducated girl did not know that she was under no obligation to so be a witness against herself. Unfair and unlawful advantage was taken of her in this respect. Practically all of the testimony which is claimed to support the theory of her sanity is based upon what the doctors testified they saw and learned on the occasions of their visits to her. If her rights had been preserved that testimony could not have been secured and would not have been offered against her in the trial of this case. Reversible error occurred in so securing the testimony of this appellant in violation of her constitutional immunity.

The appellant interposed an affirmative defense of immunity from conviction and punishment by reason of temporary insanity. The burden rests upon her to sustain this defense by a preponderance of the evidence. Let us pause for a moment and consider the circumstances involved and culminating in the death of this child. Appellant was not, as testified to by the doctors in effect, of a high grade of intelligence. She had been shunted about from home to home during her girlhood. About the only admirable thing in her young life was the sympathetic care and devotion of Agnes O'Conner in taking an interest in and looking after her welfare during her life following the death of her mother and her marriage. Difficulty was encountered in securing competent testimony concerning some of the conditions involved. However, it is apparent—in any event it is not disputed, but that she married her husband two days before the birth of the child. He knew her condition when he married her but supposed he was the father of the child. The birth of a fully matured baby, however, indicated to him that such was not the fact. This defendant, for the first time in her life, found some one whom she loved and whom she believed loved her. He refused to have anything further to do with her or the child. Broken-hearted over these culminating conditions, is it at all surprising that her mind broke and she lost her mental balance? There is enough in the record forecast to support the assertion from the appellant that the next day after the baby was born she arose from her bed, went to an adjoining room and attempted to interview her husband as to what the future of their relations would be. Police officer Michael Flynn testified that appellant said to him "Well, my hus-

band told me that the baby didn't belong to him or I, as it didn't look like either of us." Record page 12. Thomas P. O'Horo, police officer, testified, record p. 8, that the appellant said to him it wasn't her baby. This indicates the unsettled condition of her mind. The abnormality of the act indicates insanity. There is no greater love under ordinary conditions  than that of a mother for her little baby, and that a mother who takes the life of her child is a strong indication of an abnormal or irresponsible mental condition. Dr. Kocialek, in his testimony, enlarges upon the fact of the frequency with which pregnant women and mothers soon after child birth are afflicted with delusions to unsettled, abnormal mental conditions.

It is agreed in the stipulation and agreement of counsel for the respective sides that there were several prospective jurors dismissed by the trial court upon his own motion, after questioning by the court, neither counsel being given an opportunity for questioning the said jurors so dismissed. While it is primarily the right of the trial court to interrogate prospective jurors on their voir dire, it is also the recognized right of counsel to make inquiries in this regard. It is the final conclusion of this court that the judgment of the Court of Common Pleas should be and it is reversed and the cause remanded, for the reason that the verdict is against the manifest weight of the evidence, for the violation of the constitutional immunity of the appellant from testifying against herself, and further taking into consideration the numerous conditions and situations involved in this case, originating in part from the inability to secure a bill of exceptions of the third trial, the one from which error is prosecuted, the appellant was prejudicially deprived of a legal right to have a bill of exceptions of the testimony in that particular case.

While mindful of the case of **State ex C. P. Court, 131 Oh St 23,** where it was held that a writ of mandamus would not lie to the judge of the Court of Common Pleas to appoint a stenographic reporter as an official shorthand reporter and assistants, as provided by law, nevertheless the right of litigants as defendants in criminal cases to have the services of an official court reporter to take the testimony in shorthand and introduced in evidence in a trial has been so long and so universally observed that a litigant is justified in the belief that such a reporter would be furnished in that in the event that he should desire to do so, he may prosecute his action to a higher court, and especially under circumstances as involved in the instant case, where a reporter was ostensibly taking the testimony and which has failed of realization by reason of the conditions hereinbefore stated, such a calamity has been inflicted upon a litigant that it may be said it is apprehended when deprived of such privilege that he has not had a fair trial.

In fairness and justice to this unfortunate woman, who is now under sentence of imprisonment for life, she ought to have such a trial as has been accorded so far as right to every other person  accused of crime in this country, that is, by having a stenographer take and preserve the testimony. This reason is also recognized as reversible.

Judgment reversed and cause remanded.

NICHOLS and CARTER, JJ, concur.